SHAW (HINDMAN v.). See Case No. 6,514.
SHAW (KING v.). See Case No. 7,803.

## Case No. 12,721.
### SHAW v. The LETHE.
[Bee, 424.] [1]

Admiralty Court, Pennsylvania.　1781.

SEAMEN —WAGES—SURGEON —DECREASE IN RISK.

A surgeon ships at Philadelphia, in time of war, for Bourdeaux and back again. While the ship is at Bourdeaux, peace takes place. The ship returns to Philadelphia, which terminates the voyage. The surgeon's wages shall not be lessened on account of the decrease of the risk on the homeward voyage.

[Cited in Gurney v. Crockett, Case No. 5,874; Waring v. Clarke, 5 How. (46 U. S.) 480.]

In admiralty.

HOPKINSON, J. Thomas Shaw, the libellant, entered on board the ship Lethe, as surgeon, and contracted to serve in that capacity from Philadelphia to Bourdeaux, and back again, for the wages of £15 per month. It was then war, and so continued till the vessel arrived at Bourdeaux: whilst she was there in port, peace took place. The libellant continued on board, and returned with the vessel to Philadelphia, and now demands the stipulated wages of £15 per month, notwithstanding the peace. Much has been said respecting the entirety of contracts on the one hand, and the divisibility of contracts, particularly those of insurance and mercantile agreements, on the other.

It has been urged for the libellant, that the voyage to Bourdeaux and back again, must be considered as one entire voyage; and that if this vessel had been insured, or chartered, there could have been no apportionment of the premium or hire on account of the peace. Against this doctrine, the case of Stevenson v. Snow, 3 Burrows, 1237, has been cited, and fully considered. The case was—a ship was insured for a certain premium, to sail from London to Halifax; the insured warranting that she should sail with convoy from Portsmouth. She arrived at Portsmouth, but the convoy was gone. Whereupon a return of premium was demanded, deducting only the customary insurance from London to Portsmouth. The entirety of contracts was here urged against the insurers, but over-ruled by the whole court, who considered the contract as divisible, and having reference to two distinct voyages, viz. from London to Portsmouth, and from thence to Halifax; and determined that as the risk of the second voyage had never been begun, the premium for that had never inured. This case appeared at first view to apply closely to the present; but, on a nearer inspection, I find that the warranty to sail with convoy was the ground of

[1] [Reported by Hon. Thomas Bee, District Judge.]

that decision. It was that alone which rendered the voyage divisible, because it was of the essence of the contract. Had the ship sailed without, and been lost, the insurers would not have been answerable. Had she been insured from London to Halifax, without any condition annexed, and had stopped on her way at Portsmouth, and proceeded no further, the voyage would not, I apprehend, have been deemed divisible on that account, nor the premium apportioned; so that the warranty to sail with convoy was the foundation of the contract, which failing, the contract failed, so far as the same had respect thereto. The voyage from London to Portsmouth seems to be no more than a necessary passage to the place where the substantial part of the contract was to take effect; where the premium was to be earned by the commencement of the risk under the condition specified. But I find nothing parallel with this in the articles of the ship Lethe: no contingency mentioned; but only a simple contract for a voyage to Bourdeaux and back again, in consideration of certain services to be performed on the one part, and certain wages to be paid on the other. If there is any similarity in the two cases it consists in this: that, as in the one, the sailing with convoy was the ground of the quantum of the premium; so in the other, the war was the ground of the quantum of wages. In the case referred to, the contingency was fully recognized in the contract: the ship was warranted to sail with convoy, but no contingencies are provided for in the Lethe's articles. If the insured vessel had sailed with the convoy, though but for one day, and returned, it cannot be supposed that any part of the premium would have been restored. That the mere arrival of a vessel at a port or ports cannot be construed as a division of the voyage delineated by the articles, is manifest from a current of law and practice; so it was determined in the case of Bermon v. Woodbridge, Doug. 781, and numberless charterparties, insurances, and articles for mariners' wages have reference to circuitous voyages. Nor was it understood, that a fortuitous increase or diminution of the risk, or any alteration of circumstances between one port of destination and another, would affect the contract, unless provided for by the terms of the agreement. But it hath been strongly urged, that the high wages promised, and the nature of the service to be performed, have reference to war only; and that as peace took place whilst the vesssel was safe in port, the voyage, from the manifest object of the contract, became divisible: and that it would be very hard to bind the master or owners to the most severe construction of the articles, and make them pay for services, which, from an unforeseen change of affairs, were rendered impracticable.

Although there is an equitable force in this argument, yet, under the circumstances

of the case, there seems to have been an obvious duty on the part of the master to have entitled him to an equitable relief from the binding force of the articles. He should have proposed to pay off the crew at Bourdeaux, and tendered a new contract on peace establishment, protesting against the former articles. Nor is this a mere ceremony, but what substantial justice seems to require. The mariners, under the articles, could not leave the ship without incurring a penalty. If then they are detained on board without any explanation, notwithstanding the great change of circumstances, they had sufficient reason to conclude, that they were continued in the service upon the terms of the subsisting contract: and this reasoning will well apply if the case be reversed. Suppose the mariner had engaged in time of peace, and war had broke out during the voyage, and he had made no declaration that he was dissatisfied with the terms of his contract, or expected war wages in consideration of the risk he was to run, I believe there are few masters of vessels who would not urge his silence as an acquiescence in the continuation of the contract, and bind him down to the terms of the original contract. It is so natural to expect some declaration of the will of contracting parties, when circumstances out of the reach of either have occurred, which totally alters the principles upon which the contract was formed, that an omission of such declaration can have no other interpretation, but that of wilful neglect or deep design, neither of which is the law disposed to countenance. Hence, probably, arose the custom of protests, in cases of wreck, illegal capture, fire, and other unforeseen and unavoidable accidents.

One other argument hath been urged for the respondents, viz. that freight is the mother of wages; inferring, that as this vessel received only peace freight from Bourdeaux to Philadelphia, no more than peace wages ought to be allowed for that part of the voyage. It does not appear in testimony what freight this vessel received: but if it did, I see no force in the argument. There is, in fact, no connexion between freight and the quantum of wages; nor are the mariners ever privy to the terms on which a cargo hath been shipped. It is only a law of policy which arbitrarily makes the payment (not the rate per month) of the wages to depend on the safe conduct of the cargo, in order to induce the mariners to exert themselves in case of wreck, to save as much as possible, knowing, that if the whole be lost, they must lose the whole of their wages. If the freight is thus called the mother, the service performed may well be deemed the father, of the mariner's wages, that being the real and legal consideration. There is no doubt but the mariner shall have his wages, in cases where no freight at all is received; as in vessels sailing with ballast only, which often happens. The truth is, the mariner's lien is on the ship, and not on the cargo. Nor was it ever known, that freight could be attached in the merchant's hands to answer for mariner's wages, but the ship is liable under all circumstances.

I have not noticed the ship's going to Teneriffe from Bourdeaux before she came to Philadelphia, as this circumstance, if it has any operation at all, must be against the master, who ought not to benefit by his own deviation from the articles.

After mature consideration, I cannot find sufficient reason to give a different decision now, from what was lately given in the case of M'Culloch v. The Lethe. [Case No. 8,738]. The continuation of the libellant on board, after it was known that peace had taken place, without any declaration of the master, that he expected the terms of the contract should be changed, is too strong a circumstance to be got over. But, as I think it a hard case, I would recommend an appeal; that the law and arguments may be again considered by another court.

Judgment.—That the libellant receive wages agreeably to the contract; and that he pay one half, and the respondent the other half of the costs of suit.

An appeal—and the court of appeals confirmed the above sentence; and gave the appellee costs of suit, and interest on his wages, from the date of the decree in the admiralty. [Case not reported.]